UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| CINDI ADAMS, Personal Representative of the Estate of Geoffrey T. Adams, | Case No. 3:19-cv-00804-AC |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

ACOSTA, Magistrate Judge

Cindi Adams, the mother of decedent Geoffrey T. Adams and the personal representative of Adams's estate ("Plaintiff"), brings this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671-2680, to recover damages against the United States ("Defendant") for wrongful death.  On August 7, 2015, Adams was admitted to Unit 5C, an acute inpatient psychiatric unit at the Veterans Administration Medical Center in Portland, Oregon

Page 1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

("Portland VAMC"), after reporting a recent suicide attempt.  Following four days of care on the unit, Adams was discharged with instructions for establishing outpatient alcohol abuse treatment that same day.  He did not establish outpatient treatment or respond to further communications from the Portland VAMC.

On September 4, 2015, Adams was found deceased in his dorm room at Portland State University. His death was ruled a suicide.  Plaintiff contends substandard treatment by the Portland VAMC and premature discharge from Unit 5C proximately caused her son's death.  She asserts one claims for wrongful death under the Federal Tort Claims Act ("FTCA"), *see* 28 U.S.C. §§ 1346(b)(1) and 2672, and Oregon law.  (Compl. ¶ 15, ECF No. 1).

The government contends Adams's medical team met the applicable standard of care at all times during his stay in Unit 5C and that his discharge was not premature.  It further contends that, because Adams committed suicide nearly a month after he was discharged from Unit 5C, Plaintiff cannot establish the causation element of her claim.

Pursuant to the FTCA, Plaintiff's claim proceeded to a bench trial, which began on December 8, 2021.  Following the three-day trial, the parties submitted to the court their respective proposed Findings of Fact and Conclusions of Law.  (ECF Nos. 50, 51).  Upon review of the pleadings, sworn testimony of witnesses, other evidence introduced at trial by the parties,[1] and final arguments, the court makes the following Findings of Fact and Conclusions of Law as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

\ \ \ \ \

---

[1] The court has received into evidence all the stipulated exhibits. (Joint Exhibit List, ECF No. 29)

Page 2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Findings Of Fact*

I.     VA Guidelines for Managing Patients at Risk of Suicide

1.  Suicide is a persistent and growing public health problem for United States' veterans.  To assist veterans living with suicidal ideation—a term used to describe thoughts of ending one's life or engaging in suicidal behaviors—the Veterans' Health Administration (the "VA") has developed guidelines for clinicians evaluating patients who may be at risk for suicide.  VA 2013 Clinical Practice Guideline for the Assessment and Management of Patients at Risk for Suicide ("VA Guidelines"), Ex. 20); Tr. 298.  The guidelines are also used to educate resident physicians as they learn to conduct risk assessments and propose interventions for patients.  Tr. 215.

2.  The VA Guidelines are developed through expert consensus by bringing together a large group of clinicians, researchers, and policymakers to review available scientific evidence and to develop formal practice guidelines and suggestions for good care.  Tr. 291.

3.  At trial, Defendant presented Craig Bryan, PsyD, as an expert witness.  Tr. 288.  Dr. Bryan is a licensed clinical psychologist certified in cognitive behavioral therapy and currently a professor in the Department of Psychiatry and Behavioral Health at Ohio State University. Tr. 289.  Dr. Bryan has published and contributed to approximately 250 peer reviewed articles and been involved in various studies on acute inpatient facilities.  Tr. 290; Bryan Curriculum Vitae, Ex. 16.  Much of his research focuses specifically on cognitive behavioral treatments for service members and veteran suicide prevention.  Tr. 289-290.

4.  In preparation for trial, Dr. Bryan reviewed Adams's medical records and the VA Guidelines.  Tr. 290.  Dr. Bryan explained that the purpose of the VA Guidelines is: (1) to

Page 3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

summarize the available scientific evidence related to the care and prevention of suicide risk; and (2) to provide general principles and recommendations for treatment and risk management in medical health settings.  Tr. 291.

5.   At trial, Plaintiff presented Thomas Joiner, Ph.D., as an expert witness.  Tr. 71.  Dr. Joiner is a licensed clinical psychologist who currently directs an outpatient clinic at Florida State University.  Tr. 72.  He is an expert in suicide risk assessment and prevention and has conducted numerous studies involving suicidality and suicide risk assessment.  Tr. 74.  As a researcher, Dr. Joiner is not responsible for writing treatment plans and discharge orders or prescribing medication.  Tr. 111-112, 115.  His most recent relevant experience treating patients in inpatient settings is over twenty-five years ago.  Tr. 76, 108, 111-112.

6.   Dr. Joiner is familiar with the VA Guidelines, which specifically reference his research on the distinctions between chronic and acute dimensions of suicide risk and discuss how those risk factors are affected in adult inpatient care settings.  Ex. 20 at 70; Tr. 292.

7.   The VA Guidelines are divided into several sections, each of which focus on different stages in the care and management of patients at risk of suicide.  Tr. 294.  These divisions include initial screening and suicide risk assessment, determining appropriate care settings, treatment recommendations, and discharge and follow-up care.  Tr. 294; *see generally* Ex. 20.  The Guidelines recommend conducting both a formal initial assessment and continual assessments throughout a patient's care in order to ascertain and monitor the patient's immediate "level of risk" for suicide.  Tr. 296; Ex. 20 at 58-59.

A.    *Screening and Suicide Risk Assessment*

8.  A suicide risk assessment is dynamic process, in which the clinician observes and interacts with a patient to identify and monitor fluctuations in the patients "risk factors" and "protective factors." Tr. 296-97. Risk factors are those that have found to be statistically related to the presence of suicidal behaviors, though they do not necessarily impart a causal relationship. Ex. 20 at 37. Risk factors may be modifiable points that can serve as targets for intervention, such as houselessness, legal difficulties, or social support barriers. *Id.* However, some risk factors are considered non-modifiable, or chronic. *Id.* Chronic factors may include a patient's demographic characteristics, family medical history, and experience with past trauma. *Id.*; Tr. 297. Protective factors are capacities, qualities, or environmental and personal resources that drive a patient toward stability and may reduce the risk for suicide. Ex. 20 at 39; Tr. 298.

9.  To better assess a patient's risk of suicide, the VA Guidelines categorize the patient's "level of risk" as acute or chronic. Acute risk, also known as imminent risk, typically refers to a period of intensely heightened risk suggesting suicidal behavior is highly probable within the next 24 to 48 hours. Tr. 87, 300. When triaging patients to determine the level of resources and focus required, the VA Guidelines further characterize acute risk as either "low," "intermediate," or "high." Tr. 300; Ex. 20 at 48. This characterization also enables the clinician to monitor fluctuations in an individual patient's level of risk. Tr. 301.

10. In contrast to acute risk factors, patients also may have chronic suicide risk factors, which are characteristics, such as mental health disorders or substance addictions, that require long-term treatment. Tr. 237.

B.    *Determining the Appropriate Care Setting*

Page 5 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

11. After a clinician has identified a patient's imminent level of risk, she must determine the appropriate care setting "that provides the patient at risk of suicide maximal safety in the least restrictive environment." Ex. 20 at 58-59.

12. The Guidelines describe three domestic care settings relevant to this litigation: (1) emergency departments; (2) inpatient hospital units; and (3) outpatient specialty care clinics. *Id.* Each setting is designed to provide care and safety according to a patient's imminent level of risk. For instance, the emergency department is an "appropriate setting for initial evaluation and short-term monitoring of patients at any severity level." *Id.* at 59.

13. The inpatient care setting is "the highest level of care for patients at imminent risk of suicide." *Id.* at 60. As such, the decision to admit [an individual] to inpatient care oftentimes is dictated by that notion of imminence." Tr. 305, 308. An advantage of this setting is "the ability to have the patient in an environment that is engineered to diminish access to lethal means." Ex. 20 at 60. To prevent self-harm, inpatient settings restrict patient autonomy and provide little-to-no privacy. Tr. 390. Given the restrictive environment, inpatient settings are not designed to provide the longitudinal treatment necessary to treat chronic risks factors of suicide. Tr. 390; Ex. 20 at 59. Research conducted by Dr. Joiner suggests longer stays in an inpatient setting may worsen a patient's suicidality. Ex. 20 at 70; Tr. 397.

14. While acute inpatient settings safely restrain patients in crisis, outpatient specialty care treatments are designed to prevent the recurrence of such crises by teaching skills and behaviors to enable individuals to mitigate and respond to the risk factors in their lives. Tr.

319.  Because the focus of outpatient treatment is longitudinal, it is considered the most effective treatment option for chronic suicide risk factors.  Tr. 317.

C.      *Inpatient and Outpatient Treatment Recommendations*

15. The VA Guidelines provide that "patients should receive optimal evidence-based treatment for any mental health and medical conditions that may be related to the risk of suicide." Ex. 20 at 89.  Evidence-based practice refers to clinical or medical care that is heavily influenced by scientific findings.  Tr. 293.

16. Generally, inpatient treatment options target the immediate crisis, while outpatient treatments are longitudinally focused at addressing a patient's underlying medical or mental health conditions to prevent future crises.  *Id.*  For instance, inpatient care targets the immediate crisis through treatments such as medically assisted detox, medications, and supportive motivational therapies.  Tr. 391, 395.

17. In outpatient programs, longitudinal treatment options may include substance abuse treatment programs and dialectical behavioral therapy.  Tr. 392-93.  At substance abuse treatment programs, addiction therapists and psychiatrists evaluate and work with veterans to develop tools and care options for coping with alcohol and substance additions.  Tr. 393.

18. Dialectical behavioral therapy ("DBT") is a longitudinal psychotherapeutic intervention treatment designed to assist chronically suicidal individuals, especially those suffering from personality disorders.  Tr. 314, 392; Ex. 20 at 91, 97.  The VA Guidelines describe that DBT places "emphasis on managing the patient's multiple, severe problems, suicidal behavior, and extreme emotional sensitivity by providing structured, staged treatment and

multiple sources of support." Ex. 20 at 91. DBT treatments include both group and individual participation over a period of six months to one year. Tr. 314-15, 392.

D. *Discharge and Follow Up*

19. With respect to discharge planning, the VA Guidelines provide that "although suicidality may persist, the treatment goal is to transition the patient toward a less restrictive environment based on clinical improvement and the assessment that the suicide risk has been reduced." Ex. 20 at 59. Discharge planning begins soon after the patient is admitted to inpatient care, with the goal of enhancing continuity of the care and mitigating risk factors that could contribute to suicide after discharge. Ex. 20 at 69; Tr. 225.

20. The decision to discharge a patient is based on numerous factors unique to both the individual patient and to the treatment environment. Ex. 20 at 61. There is no "check-box" formula, though the VA Guidelines recommend the clinician assess that: (1) the patient has no current suicidal intent; (2) the patients' active psychiatrist symptoms are stable enough to allow for reduction in level of care; and (3) the patient has capacity and willingness to follow a personalized safety plan. *Id.* The ultimate decision for discharge is "based on clinical judgment and the experience of the provider." *Id.*

21. Because patients discharged from psychiatric inpatient units often experience heightened risk of suicide in the weeks and months following discharge, the VA Guidelines recommend establishing an individual Safety Plan with the patient and coordinating with outpatient programs and resources to address the patient's needs. *Id.* at 81-82.

22. The VA Guidelines provide that follow-up with the patient "should commence in the immediate period after discharge from acute care settings." *Id.* at 124. The frequency and

method of contact is determined on an individual basis. *Id.* If a patient continues to be at risk for suicide and does not respond to follow-up appointments or contact attempts, then "available data should be used to assess the patient's level of risk and corresponding effort should be made" to contact the patient. *Id.* at 128.

II.    Geoffrey Adams's Background and Medical History

23.  Adams was born on March 22, 1982. City of Portland Investigation, Ex. 10 at 1. On September 4, 2015, he was found deceased in his residential dorm room at Portland State University. *Id.* Adams had fatally overdosed on heroin and cocaine, and his death was ruled a suicide. Multnomah Cty. Med. Report, Ex. 11 at 3. He was 33 years old. *Id.* He is survived by his mother, sister, and two biological children. Tr. 10. Adams's mother is the personal representative of his estate.

24.  During his adult life, Mr. Adams had a fourteen-year-history of alcohol abuse, substance abuse, and mental illness, including chronic suicidality and numerous suicide attempts. Tr. 27-29, 32, 52; Ex. 8 at 208-210. Treatment notes describe diagnoses of depression, borderline personality disorder, and unspecified psychosis. *Id.* at 395, 493.

25.  After graduating high school, Adams enlisted in the United States Navy in 2001. Tr. 25. In late 2002, he attempted suicide and was hospitalized as an inpatient. Tr. 20, 28. He was discharged from the Navy in 2003, under general but honorable conditions. Tr. 31.

26.  Following his discharge from the Navy, Adams continued to struggle with issues related to mental health, substance abuse, and chronic suicidality. Tr. 31. In approximately 2005, while living in Boston, Adams was hospitalized as an inpatient after attempting to commit suicide. Tr. 33. Soon after, he received treatment at a California facility. Tr. 35. Plaintiff

Page 9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

testified that, after this treatment, her son experienced a period of sobriety, although he later continued to struggle with substance abuse and sometimes "could not function at all." Tr. 36.  At one point, Adams intentionally overdosed on Vicodin "with the intent of taking his life."  Tr. 39.  He was also hospitalized twice in 2007, for symptoms related to cocaine abuse and for presumed serotonin syndrome secondary to antidepressant medication. Providence St. Vincent Records, Ex. 8 at 5-7, 48, 51.

27. Adams began receiving VA disability benefits in 2012, and he established care with the Portland VAMC to treat a back condition.  VA CPRS Chart, Ex. 3 at 843.  At the time, he reported a desire to speak with a mental health provider, but he later declined to follow up with providers for months.  *Id.* at 649-675.  When he did follow up, the medical report suggests he was solely focused on obtaining stimulant medication prescribed for people with attention deficit disorder, a diagnosis Adams had not received.  *Id.*; Tr. 323.

28. Between initiating care with the VA in 2012 and his death in 2015, Adams's medical records are replete with examples of refusing treatment; refusing to heed medical advice; refusing to follow through and attend various recommended psychotherapy programs; and refusing to engage in mental health and substance abuse treatment.  Tr. 121, 128, 134, 138, 316, 323-324.  Despite this history, Adams's medical providers continued to try reengaging him in treatment.  Tr. 417-25, 439-44; Ex. 10 at 25.

29. In early 2015, Adams's mental health declined further.  On February 10, 2015, he was voluntarily admitted to inpatient care at the Portland VAMC after reporting three recent suicide attempts to his outpatient therapist.  Ex. 3 at 493-497.   During his admission interview, Adams reported he had been drinking heavily, experiencing auditory

hallucinations, and was dealing with a recent breakup and housing issues. *Id.* at 493. Clinicians noted his heavy use of alcohol and other substances were likely exacerbating his psychiatric difficulties, and recommended he undergo treatment with an outpatient substance abuse program run by the VA. *Id.* at 461. Adams declined, stating he would address his substance abuse issues via Alcoholics Anonymous. Tr. 121, 234-235. After three days, Adams was discharged to an outpatient substance abuse treatment program, which he soon discontinued. Ex. 3 at 427-37.

30. In April 2015, Adams presented to the VA emergency department for evaluation after he had been in crisis earlier in the week. *Id.* at 395. Evaluation notes described his presenting behavior as linear and without evidence of paranoia, and Adams denied suicidal ideation. *Id.* Inpatient admission to inpatient care was offered but he declined, insisting he would work with his outpatient psychiatrist. *Id.* Noting that his imminent risk for suicide was mitigated by his lack of current psychotic symptoms, the examining clinician determined Adams did not meet the criteria for involuntary commitment, and he was discharged with medications, instructions to abstain from alcohol and recreational drugs, and plans to follow up with his outpatient psychiatrist. *Id.* at 398.

31. In June 2015, Adams declined housing assistance from the VA. Ex. 3 at 359. He enrolled as a student at Portland State University, where he studied music and lived in a dorm room with a roommate. Ex. 9 at 1, 48.

III.   August 2015 Inpatient Psychiatric Care at the Portland VAMC Unit 5C

   A.  *Unit 5C Purpose and Staff*

32. After experiencing a period of relative stability in June and July 2015, Mr. Adams attempted suicide in early August and was subsequently admitted to Unit 5C, an acute inpatient ward at the Portland VAMC. Ex. 3 at 328. Mr. Adams remained on Unit 5C from August 7, 2015, until August 11, 2015. *Id.* at 262-328.

33. As an inpatient care setting, the purpose of Unit 5C is to treat acute symptoms of mental illness and reduce a patient's imminent risk of suicide. Tr. 237. To stabilize and care for patients in crisis, Unit 5C offers treatments such as medical-assisted detox, medications, supportive motivational therapies, and milieu therapy to provide therapeutic benefits through socialization. Tr. 391, 395. In interacting with patients, doctors in the unit use a technique called "motivational interviewing" to engage with patients "about their internal desires for making a particular change." Tr. 218.

34. Because a primary goal of Unit 5C is safety, it is a highly restrictive unit where patients are not free to come and go voluntarily. Tr. 390, 396. Every aspect of the environment is designed to prevent self-harm. Tr. 390. Over time, the authoritarian environment can be invalidating of a patient's personal autonomy, and patients may regress. Tr. 398.

35. Unit 5C is not designed to treat chronic risk factors, which require longitudinal outpatient treatments. Tr. 398.

36. Unit 5C is staffed by attending physicians, resident physicians, medical students, nursing staff, social workers, occupational therapists, and psychologists. Tr. 215, 395. Ultimate treatment responsibilities lie with the attending physician, who must approve all treatment and discharge recommendations. Tr. 396. However, all unit staff monitor patients for

potential risks associated with suicidality, including self-harming behaviors and plans for self-harm. Tr. 399. Assessments are conducted on an hourly and daily basis. Tr. 398.

37. During his four-day stay on Unit 5C, Adams received care from physicians, medical residents, psychiatric nurses, and social workers, but primarily by David Douglas, M.D., Davíd Nagarkatti-Gude, M.D., and Kristen Dunaway, M.D. Tr. 215. Defendants presented Dr. Douglas, Dr. Nagarkatti-Gude, and Dr. Dunaway as witnesses at trial.

38. Dr. David Douglas is a psychiatrist board-certified by the American Board of Psychiatry and Neurology. Douglas Curriculum Vitae, Ex. 19. In 2015, Dr. Douglas was the chief health information officer and a staff psychiatrist at the Portland VAMC. Tr. 156. As a staff psychiatrist, he served as an on-call attending in Unit 5C and treated patients in the outpatient clinic. Tr. 156. Dr. Douglass was the attending physician overseeing Adams's care from August 8, 2015, until August 10, 2015.

39. Dr. Davíd Nagarkatti-Gude is a psychiatrist who is board certified by the American Board of Psychiatry and Neurology. Nagarkatti-Gude Curriculum Vitae, Ex. 18. He received an M.D. and Ph.D. from Virginia Commonwealth University in 2014. Tr. 213-214. In 2015, Dr. Nagarkatti-Gude was in his second year of residency and had been working on Unit 5C for approximately four months. Tr. 214. Dr. Nagarkatti-Gude was the resident physician treating Adams on August 10, 2015, and August 11, 2015.

40. Dr. Kristen Dunaway is a psychiatrist board-certified by the American Board of Psychiatry and Neurology. Dunaway Curriculum Vitae, Ex. 17. She is currently the clinical director of the mental health division and chief of psychology at the Portland VAMC. Tr. 384. In 2015, Dr. Dunaway was a staff psychiatrist at the Portland VAMC and served as a full-

time hospitalist working on Unit 5C.  Tr. 285.  Dr. Dunaway was the attending physician in charge of Mr. Adams's care on August 10, 2015 and August 11, 2015.

B. *Friday, August 7, 2015*

41. On the evening of Friday, August 7, 2015, Adams arrived at the door of Unit 5C requesting admission.  Tr. 159.  He was sent to the emergency room for initial evaluation, and subsequently admitted to Unit 5C after he expressed suicidal ideation.  Tr. 159.  He was placed in care of the on-call attending physician, Dr. Douglas, and the Unit 5C mental health team.

42. A pre-admission evaluation note written by a VA social worker described Adams as malodorous, disheveled, unwashed, irritable, and reluctant to make eye contact or cooperate with interviews.  Ex. 3 at 328.  He reported a recent suicide attempt, disclosed future plans to overdose on illicit drugs, and indicated he had been drinking heavily; and became paranoid during evaluation.  *Id.*

43. On examination by psychiatry resident that night, Adams was irritable and minimally cooperative.  *Id.* at 304.  He lay on the floor and refused to answer questions.  *Id.*  The resident physician diagnosed.  Adams as exhibiting symptoms of borderline personality disorder.  Tr. 174.  She also conducted a suicide risk assessment, and she rated Adams's risk as "moderate," after assessing he had some major risk factors for suicide but did not intend to act on suicidal thoughts in the near term.  Tr. 174; Ex. 3 at 302-04.

44. The resident physician outlined a treatment plan prioritizing treatment for suicidal ideation and alcohol withdrawal.  Tr. 164-164; Ex. 3 at 302.  Adams was placed on protocol to monitor for alcohol withdrawal symptoms.  Tr. 176.  He was prescribed Hydroxyzine to

Page 14 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

help with sleep and anxiety.  His plan also included milieu therapy for stabilization and social work to provide him with limited psychotherapy and immediate supportive interventions, with the goal of motivating him toward outpatient, longitudinal treatment. Tr. 164-69, 176, 391.  An attending physician approved this plan.  Ex. 3 at 302.

C.  *Saturday, August 8, 2015, and Sunday August 9, 2015*

45. On Saturday morning, Dr. Douglas, the on-call attending, met with Adams after reviewing his medical and mental health history.  Tr. 158.

46. Dr. Douglas testified that, during the initial meeting, Adams was uncooperative and angry. Tr. 170.  Dr. Douglass explained he used motivational interviewing to try to establish a rapport with Adams, in order to encourage Adams to view him as an ally and work cooperatively on his problems.  Tr. 170-71.  Adams responded that he only wanted HIV testing, which was ordered.  Tr. 170.  Dr. Douglas hoped that the testing "would be the initial point where [they] could begin working on the same team" to form a "therapeutic alliance."  Tr. 170.

47. Upon evaluation, Dr. Douglas assessed that Adams likely had a mood disorder with suicidal ideation that was associated with substance abuse and a personality disorder.  Tr. 174.  Dr. Douglas formulated a treatment plan that included alcohol withdrawal protocol, monitoring for suicidal ideation, serial mental status exams, resuming medication, checking for HIV and Hepatitis C, and consideration of referral to DBT.  Tr. 175-76; Ex. 3 at 299-300.

48. Throughout the weekend, Adams's mood and affect were tracked through physician and nursing notes.  Providers continued him on alcohol withdrawal protocol, and he did not

require medically assisted withdrawal treatment.  Tr. 178.  Despite availability, Adams did not participate in Alcoholics Anonymous meetings on the ward.  Tr. 183.

49.  While Adams continued to be resistant to attempts to engage him in treatment, his medical records reflect the following improvements over the weekend:  He resumed taking his anxiety medication and it was effective.  Tr. 180, 182.  His alcohol withdrawal scores remained low and eventually went to zero.  Tr. 185.  He was eating regularly.  Tr. 180-81.  His sleep was improving.  Tr. 181-82.  He began to interact with select other patients in social milieu, though these interactions were limited.  Tr. 183.  Adams denied suicidal ideation on serial mental status exams.  Tr. 181-82; Ex. 3 at 267, 292.

50.  Dr. Douglas testified that, based on his review of the medical records, Adams's uncooperativeness with mental health providers was not unusual behavior.  Tr. 172.  He explained that it can be especially difficult to engage patients with borderline personality disorder in an inpatient setting because the restrictive environment can cause patients to regress and be difficult to treat.  Tr. 172.

51.  On Sunday, Dr. Douglas noted that continued hospitalization was necessary for Adams due to the need for ongoing medications and concerns regarding his stability should he be discharged at that time.  Tr. 184; Ex. 3 at 289.  Dr. Douglas testified that he felt Adams would not have been stable enough for discharge until his alcohol withdrawal protocol ended.  Tr. 184.

D.  *Monday, August 10, 2015*

52.  On Monday, Dr. Dunaway and Dr. Nagarkatti-Gude assumed care of Adams as his attending and resident physicians, respectively.  Tr. 185, 215.  Before meeting with Adams,

Page 16 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

they reviewed his medical records and met with the treatment team to discuss his case.  Tr. 219, 401.  The physicians then interviewed Adams together, with Dr. Nagarkatti-Gude leading the interview.  Tr. 221, 400.

53. During their initial interview, Adams was primarily focused on physical pain he felt in his leg.  Tr. 224.  Dr. Nagarkatti-Gude examined the leg and address his pain with oral and topical medications.  Tr. 225, 402.  This helped to establish a working relationship with Adams, who became "cooperative" and "full participatory" in this interview with respect to his leg.  Tr. 224.  To encourage Adams to engage in his own treatment, Dr. Nagarkatti-Gude used motivational interviewing techniques.  Tr. 224.

54. The physicians also assessed Adams's mental state, noting his thought process appeared "linear, logical, goal oriented."  Tr. 229; Ex. 3 at 275.  They described his judgment as "moderate" because, while he had voluntarily presented himself to the hospital, he had declined to engage with physicians.  Tr. 231.  They also noted Adams had been interacting with select peers in the large day room and was beginning to consolidate his sleep at night.  Tr. 405.

55. During a suicide risk assessment, Adams reported ongoing suicidal ideation but refused to discuss imminent plans or intent.  Tr. 231; Ex. 3 at 276.  Dr. Nagarkatti-Gude noted Adams presented as "future focused" with significant concerns about maintaining his eligibility to continue with school.  Tr. 231; Ex. 3 at 276.  In particular, the physicians found it encouraging that Adams requested hospital documentation to ensure he would be able to take his finals, since this request displayed an intent to be alive to complete his coursework.  Tr. 231, 233.

56. Based on this assessment, Dr. Nagarkatti-Gude noted Adams had been living with suicidal thoughts at baseline for "quite a long period of time," and assessed that those thoughts did not represent an acute change from what he experienced previously.  Tr. 233.  Dr. Nagarkatti-Gude diagnosed Adams with alcohol use disorder, Cluster B personality traits with borderline and narcissistic symptoms, and unspecified psychosis.  Tr. 227-228. Adams did not present with agitation or psychosis.  Tr. 227-228.

57. Adams exhibited no significant symptoms of alcohol withdrawal on August 10, 2015.  Tr. 238-39, 241.  Upon interview, Adams acknowledged that he drank too much and wanted to participate in treatment for alcohol use disorder.  Tr. 225, 402.  Dr. Dunaway testified that, to her knowledge, this was the first time Adams had agreed to engage in VA-provided alcohol abuse treatment.  Tr. 423.

58. Dr. Nagarkatti-Gude and Dr. Dunaway testified that when a patient indicates interest in treatment for substance use disorder, they immediately initiate plans to connect the patient to a treatment program.  Tr. 225, 402.  At the Portland VAMC, addiction treatment occurs through the substance abuse treatment program ("SATP"), an outpatient program focused on longitudinal treatment.  Tr. 226.  As soon as Adams expressed interest in the SATP, his team on Unit 5C began coordinating with his outpatient care providers—specifically his clinical social worker, Mr. Charles Urwyler, and his outpatient psychiatrist, Dr. Eric Turner—to engage Adams in this program.  Tr. 402-03; Ex. 3 at 281.

59. Because Adams had consistently been diagnosed as having borderline personality disorder, Dr. Nagarkatti-Gude and Dr. Dunaway developed a treatment plan that also included outpatient DBT.  Tr. 403.  Dr. Dunaway testified that DBT is considered the "gold standard

evidence-based treatment for borderline personality disorder." Tr. 403, 169, 392. Adams's medical team initiated plans to quickly connect him with Mr. Urwyler, who is a DBT therapist, upon discharge. Tr. 403.

60. Dr. Nagarkatti-Gude also restarted Adams on his outpatient medications and prescribed a nicotine patch at Adams's request. Tr. 226, 238; Ex. 3 at 275-77.

61. Dr. Dunaway and Dr. Nagarkatti-Gude assessed that, on August 10, Adams was at low imminent risk, but chronically elevated risk for self-harm. Tr. 406; Ex. 3 at 276. At trial, Dr. Nagarkatti-Gude explained that "imminent risk" implies a short time frame, typically 24 hours. Tr. 236. He explained the "chronically elevated risk" assessment reflected their concern about the long-term possibility that Adams could die by suicide, and simultaneously, that they did not conclude this was something that would occur within a day or even several days. Tr. 236.

62. Based on Adams's medical chart, her interviews with him, and her professional judgment, Dr. Dunaway testified that Adams's imminent risk of self-harm was already substantially reduced on August 10. Tr. 405. Noting he had been "acutely intoxicated" when admitted to Unit 5C, Dr. Dunaway explained that this acute risk factor—which increases the likelihood of self-harm by heightening impulsivity—had abated, as Adams was "largely through withdrawal" at this point. Tr. 405.

E. *Tuesday, August 11, 2015*

63. On Tuesday morning, Adams's medical team determined he was stable with respect to his acute symptoms and therefore safe for discharge. Tr. 259-260. Several people were involved in the discharge planning, including Dr. Nagarkatti-Gude, Dr. Dunaway, and Unit

Page 19 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

5C nurses and staff.  The team also coordinated with Adams's DBT social worker, Mr. Urwyler, and his outpatient psychiatrist, Dr. Turner.  Tr. 239.

64. Because Adams's acute symptoms had stabilized, the treatment team concluded further hospitalization was not required to monitor his medications, as he had been taking his primary medications before hospitalization and reported no side effects.  Tr. 409.

65.  Although Adams expressed ongoing suicidal thoughts at baseline, his physicians found no statements or inferences indicating he was intending to act on those thoughts imminently. Tr. 253.  Adams continued to be future-oriented toward completing his coursework and participating in addiction treatment.  Tr. 253.

66. The treatment team concluded that, in light of his risk factors and protective factors, Adams continued to be at a chronically elevated risk for suicide; however, they assessed his imminent risk as low.  Tr. 254, 257.  They further concluded that evidence-based treatment to reduce his chronic risk factors was for him to receive longitudinal treatment for his alcohol use disorder through the outpatient SATP and to build coping strategies through DBT with Mr. Urwyler.  Tr. 257.  Given Adams's personality disorder diagnosis, there was significant concern that remaining in acute inpatient care would exacerbate his chronic risk factors.  Tr. 252.

67. Because Adams expressed a willingness to engage with the SATP, a critical part of his discharge plan involved engaging him in this treatment directly upon discharge.  Tr. 238, 242-43.  The treatment team acquired an appointment for Adams with the SATP access clinic that same day, scheduled about an hour after his discharge.  Tr. 242, 249-50.

68. The team arranged other appointments for outpatient treatments to ensure Adams had immediate therapeutic support after leaving the hospital. Tr. 410. They referred him back to outpatient group therapy programs and recommended follow-up with Dr. Turner. Tr. 239. The team also scheduled Adams for a DBT social work appointment on August 13, 2015, with Mr. Urwyler. Ex. 3 at 267.

69. While his medical team was explaining his discharge plan, Adams expressed a preference to remain on the unit until such time as he could transfer to a residential addiction treatment program. Tr. 241; Ex. 3 at 169. Dr. Nagarkatti-Gude explained that direct transfer to a residential program was not possible, and that he would need to connect with the SATP for evaluation prior to admission to a residential program. Tr. 250. Following their discussion, Adams expressed he was willing to attend the outpatient SATP program as a pathway to accessing the inpatient treatment he preferred. Tr. 252.

70. Dr. Nagarkatti-Gude and Dr. Dunaway testified that if Adams was not safe for discharge, he would have been kept longer on Unit 5C despite the SATP access appointment. Tr. 242, 407. Dr. Nagarkatti-Gude explained that the discharge decision was based on their assessment that Adams had low imminent risk of acting on suicidal thoughts, and that engaging him in substance abuse treatment as smoothly as possible was the best way to address his chronic risk factors. Tr. 243, 258.

71. Adams was discharged from Unit 5C at 10:40am on August 11, 2015. Ex. 3 at 263. He returned briefly after discharge for documentation to provide to his school, highlighting his intention to complete his coursework. Tr. 255. At discharge, Adams denied suicidal ideation. *Id.* He also had a copy of his Safety Plan with a list of upcoming appointments,

including a follow-up appointment with Mr. Urwyler and instructions to attend his SATP intake appointment, which was scheduled for 12:00pm that day and located across the street. *Id.*

IV.    Behavior Following Discharge and Eventual Suicide

72. Unfortunately, following discharge from Unit 5C, Adams chose not to attend the SATP access appointment. *Id.* at 262. He also did not attend his appointment with Mr. Urwyler on August 13, 2015, nor did he respond to Mr. Urwyler's multiple follow-up attempts over the next several days. *Id.* at 262. Adams's last contact with the VA was to an optician to replace lost eyeglasses on August 19, 2015. *Id.* at 260.

73. Sometime in mid-August, Adams participated in community service at Meal-on-Wheels, where he met another volunteer, Brenda Maschinot, with whom he became close friends and spoke almost every day. Tr. 203-204. Ms. Maschinot testified about their relationship at trial, explaining she and Adams often socialized after their volunteer shift by going for walks, visiting the farmers market, and singing karaoke. Tr. 205. Adams encouraged Ms. Maschinot, who had recently moved to the area, to engage with the community and showed her around town. Tr. 206.

74. During this time, Adams appeared to be excited about his college program and expressed a desire to compose music. Tr. 206. He lived on campus at Portland State University and appeared friendly with his roommate. Tr. 206. He also expressed frustration about the difficulty of getting funding for school. Tr. 206.

75. Ms. Maschinot testified that Adams sometimes drank alcohol when they were together. Tr. 205-06. He did not tell her about his recent hospitalization on Unit 5C or past suicide attempts. Tr. 209.

76. Adams finished the 2015 Summer Quarter at Portland State University; he took his finals and receive passing grades in his courses. PSU Student and Housing Records, Ex. 9 at 1. In addition, he was moving out of his dorm room and had made arrangements to move into a new dorm room as of August 31, 2015. *Id.* at 55.

77. On or about September 3, Mr. Adams contacted his mother to get the name of a private substance abuse recovery counselor she knew. Tr. 63.

78. On September 4, 2015, Adams's roommate found Adams deceased in his dorm room bed. Ex. 10 at 1. Following an autopsy, Adams's death was ruled a suicide and the cause of death "toxic effects of heroin and cocaine." *Id.*

79. Adams left a handwritten note with a phone number and message. *Id.* The phone number belonged to Ms. Maschinot; the note said "It was on purpose ask the VA." *Id.*

80. On Adams's desk was an unopened letter from Mr. Urwyler, stating he had been unsuccessful at reaching Adams by telephone and asking Adams to contact him to schedule an appointment. *Id.* at 25.

V.    Expert Testimony as to the Standard of Care

81. At trial, Plaintiff's expert, Dr. Joiner, opined that Adams's risk of suicide appeared to be "high" or "grave" at discharge. Tr. 90, 102. He further suggested that Adams's medical providers breached their standard of care by failing to keep him hospitalized another two

or three weeks to resolve his chronic mental conditions through the use of:  (1) medication

optimization; (2) DBT; and (3) motivational interviewing.  Tr. 91, 144-45.

82. Dr. Joiner provided little explanation for his assessment that Adams was at "high risk" at

discharge.  Furthermore, at trial he frequently seemed only generally familiar with relevant

details in Adams's medical records.  Tr. 109, 132-33, 137.  Given this unfamiliarity and

Dr. Joiner's background primarily as a researcher, not a treating physician, the court gives

his testimony less weight and, for the following reasons, finds his opinion on various

aspects of the standard of care unpersuasive.

*A.  Continued Hospitalization on Unit 5C*

83. Dr. Joiner's opinion that Adams would have benefitted from continued weeks of inpatient

hospitalization is controverted by his own research on chronic suicidality and by testimony

of the defense expert, Dr. Bryan.  Ex. 20 at 70, Tr. 311.  Plaintiff also presented no evidence

demonstrating Adams's condition met criteria for involuntary commitment.

84. Referring to Dr. Joiner's research on the "Interpersonal Psychological Theory of Suicide,"

the VA Guidelines explain that "suicidality may worsen in an inpatient setting" because

the setting often increases a patient's feelings of "burdensomeness—a feeling of liability

and not fulling expectations or obligations" and amplify a sense of "failed belongingness,"

while having little effect on the patient's "sense of fearlessness about lethal self-violence."

Ex. 20 at 70.

85. Dr. Bryan's testimony also illustrated the dangers associated with long-term hospitalization

on Unit 5C.  For instance, given the restrictive safety precautions taken in inpatient care,

long term care in these settings can be stigmatizing, particularly for patients with borderline

personality disorder.  Tr. 310-12.  Accordingly, the court finds that Adams would not have benefitted from additional weeks of immediate inpatient hospitalization.

B.  *Optimization of Medication*

86. With respect to Dr. Joiner's contention that medication optimization could have resolved Adams's chronic conditions or prevented his suicide, Dr. Joiner offered no detailed testimony or explanation of how the medications prescribed to Adams were inappropriate. Tr. 84.  Here, the court notes that because Dr. Joiner, as a psychologist, is not qualified to prescribe medications, his opinions regarding the appropriate medication to prescribe to Adams in the circumstances existing at the time lack appropriate foundation.

87. On this issue, the court finds the testimony of Dr. Dunaway to be more persuasive than that of Dr. Joiner.  Unlike Dr. Joiner, Dr. Dunaway has extensive experience prescribing psychiatric medications to patients in the acute inpatient psychiatric setting.  She testified that further hospitalization of Adams was not required to monitor or to optimize his medications because, at discharge, Adams had resumed taking his primary medications and reported they were effective without producing side effects.  Tr. 409.  Additionally, Adams's medical team ensured he had these medications at discharge and that his outpatient psychiatrist, Dr. Turner, was aware of the recent hospitalization.  Tr. 409-10.

88. Accordingly, the court finds Adams's medical team did not fall below the standard of care with respect to optimization of his medications.

C.  *Dialectical Behavioral Therapy*

89. Dr. Joiner next opined that Mr. Adams's medical team fell below the standard of care by not keeping Adams hospitalized to treat him with DBT.

90. As explained in the VA Guidelines and testimony, DBT is a type of outpatient psychotherapy that teaches patients skills to better regulate their emotions and to handle everyday interpersonal interactions more effectively. Tr. 85, 169, 175-77, 240, 257, 392, 402-03. DBT has been shown to be particularly effective at treating patients with borderline personality disorder. Tr. 315, 369; Ex. 20 at 96.

91. VA physicians and defense expert, Dr. Bryan, testified that while Adams certainly would have benefitted from DBT (which has a strong likelihood of preventing future suicidal behavior), this therapy could not be provided on Unit 5C because DBT is not a program that can successfully be implemented during a few weeks of inpatient hospitalization. Tr. 310, 314-15, 392. Instead, the evidence demonstrated that DBT is typically a six- or twelve-month program. Tr. 215, 310. A key component to the therapy is teaching patients how to self-regulate and to manage stressful situations, which can be experienced fully only in an outpatient setting. Tr. 310, 314-15. This testimony is corroborated by the VA Guidelines, which discuss studies regarding the duration of DBT treatment. Ex. 20 at 91.

92. Plaintiff provided no evidence explaining how two or three weeks of DBT would have effectively resolved Adams's chronic risk factors. Nor did she establish that it is the standard of care to provide such treatment in the context of an acute inpatient psychiatric admission.

93. Accordingly, the court finds Dr. Joiner's opinion that two or three weeks of inpatient DBT was required by the standard of care unpersuasive.

*D. Motivational Interviewing*

94.  Finally, Dr. Joiner concluded that VA medical providers fell below the standard of care by not treating Adams with motivational interviewing.  Tr. 77.

95. Dr. Joiner's opinion is unpersuasive.  Defense expert, Dr. Bryan, and Mr. Adams's physicians provided significant testimony explaining motivational interviewing and describing how it was used in interactions with Mr. Adams.  Tr. 170-171, 244, 291, 395, 401.

96. Motivational interviewing is not a manualized treatment unless used in a research setting. Tr. 351.  When used in the clinical setting, motivational interviewing is not a specific treatment pathway, but rather an approach to interacting with and interviewing patients. Tr. 282-83.  Dr. Nagarkatti-Gude described motivational interviewing as a "way of interacting with someone to try to get them to discuss the motivations that they already have and build up those motivations to hopefully help make a change that they have been considering." Tr. 219.  This description aligns with Dr. Joiner's own testimony, in which he described motivational interviewing as a "technique . . . to garner and consolidate motivation to change behavior." Tr. 77-78.  Similarly, Dr. Bryan described motivational interviewing as a "way of asking questions, sort of leading a patient to . . . recognize the pros and cons of treatment engagement." Tr. 324.

97. Testimony from Dr. Nagarkatti-Gude and Dr. Dunaway indicates they used motivational interviewing techniques when interacting with Adams.  Tr. 170-71, 244, 291, 395, 401. Adams's behavior on Unit 5C supports this claim.  Following his interview with Dr. Nagarkatti-Gude and Dr. Dunaway, Adams expressed—apparently for the first time in his

treatment history with the VA—a motivation to address his substance use disorder through VA programs.  Tr. 252, 239, 401-02.  Given this expressed willingness to engage in the SATP, the physicians' use of motivational interviewing appeared successful, and there was no reason to delay treatment of his chronic risk factors for further inpatient motivational intervention.  Tr. 244. Indeed, Dr. Dunaway indicated delaying treatment when a patient expresses a readiness to engage may result in lower likelihood of engagement.  Tr. 409.

98. Although Adams expressed a desire to remain as an inpatient the morning of his discharge, after discussing his options with Dr. Nagarkatti-Gude and Dr. Dunaway, he reasserted motivation to participate in the outpatient treatment recommended.  Ex. 3 at 169; Tr. 252. Further, while he later did not appear for his intake appointment to the SATP, his initial willingness to attend—as well as evidence that he confirmed his outpatient appointments prior to discharge—lend support to the possibility that, at least at the time of his discharge, Adams was motivated to participate in the recommended treatment.

99. In light of this evidence, the court is not persuaded that VA providers fell below the standard of care by not keeping Adams hospitalized for treatment with motivational interviewing.

\ \ \ \ \

*Conclusions Of Law*

I.      Jurisdiction and Governing Law

1.  Cindi Adams ("Plaintiff") brings this lawsuit against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§1346(b) and 2671-2680.  The FTCA "was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States*, 369 U.S. 1, 6 (1962).

2.  Under the FTCA, liability and damages are determined in accordance with the law of the place where the acts or omissions occurred, in this case, the State of Oregon.  *See* 28 U.S.C. §§ 1346(b)(1).

II.     Plaintiff's Claims and Negligence Standard

1.  In her Complaint, Plaintiff alleges one claim for relief: a wrongful death claim under ORS § 30.020.  Oregon's wrongful death statutes restricts recovery to the statutorily authorized beneficiaries.  ORS § 20.020(1).  Adams's mother, sister, and biological children are eligible beneficiaries under the statute.

2.  Specifically, Plaintiff contends medical providers on Unit 5C "were aware or should have been aware of Adams's acute risk of suicide" and "negligently failed to provide adequate treatment and discharged him when he was at high risk of suicide."  (*Id.* ¶ 15).  She alleges this "negligence was the proximate cause of Adam's death" and seeks to recover "economic, pecuniary, and noneconomic damages."  (*Id.* ¶ 17).

3. To prevail on her claim, Plaintiff has the burden[2] of proving that the Unit 5C medical providers were negligent in the care they rendered to Adams and that such negligence caused his death. *See Joshi v. Providence Health Sys.*, 342 Or. 152, 164 (2006). A failure by Plaintiff to meet her burden on either the standard of care or causation must result in a judgment in favor of the United States.

4. Plaintiff must establish each of the following elements of negligence under Oregon law:

   a. The degree of care, skill, and diligence used by ordinary careful physicians in the same or similar community in the same or similar circumstances as Adams's medical providers on Unit 5C;

   b. That Adams's medical providers failed to use reasonable care and diligence in their care and treatment of him; and

   c. That, as a result of the failure to exercise reasonable care, Adams died.

   *Joshi*, 342 Or. at 164.

5. "In most charges of negligence against professional persons, expert testimony is required to establish what the reasonable practice is in the community." *Getchell v. Mansfield*, 260 Or. 174, 179 (1971). Similarly, when issues of reasonable care or causation turn on facts beyond a layperson's understanding, expert testimony is necessary. *Id.*; *Austin v. Sisters of Charity*, 256 Or. 179, 185-86 (1970).

\ \ \ \ \

\ \ \ \ \

---

[2] Plaintiff's burden here is a preponderance of the evidence, *i.e.*, more likely than not. *See* ORS § 10.095(5); *see also Riley Hill Gen. Contractor, Inc. v. Tandy Corp.*, 202 Or. 290, 403 ("Proof by a 'preponderance of the evidence' means . . . the jury must believe . . . the facts asserted are more probably true than false.").

A.  *Standard of Care*

6.  Under Oregon law, "[a] physician licensed to practice medicine or podiatry by the Oregon Medical Board has the duty to use that degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community of the physician or a similar community."  ORS § 677.095.

7.  At trial, Plaintiff and Defendant each presented an expert witness to establish the standard of care applicable to Adams's medical treatment while he was on Unit 5C.  Throughout trial, the parties also jointly referenced the Veterans Health Administration Clinical Practice Guideline for the Assessment and Management of Patients at Risk for Suicide ("VA Guidelines"), published in 2013.  While the VA Guidelines do not independently set the standard of care for physicians working in this area of medicine, the court finds the procedures and recommendations set forth therein persuasive, given their basis in available scientific data and wide-ranging expert consensus, including the research of the parties' respective experts, Dr. Joiner and Dr. Bryan.

8.  For the reasons explained in the Findings of Fact section, the court does not find the opinions of Plaintiff's expert, Dr. Joiner, persuasive with respect to Adams's acute risk level at discharge, continued hospitalization, optimization of medication, DBT, or motivational interviewing.   Plaintiff has not established, by a preponderance of the evidence that Adams's medical providers fell below the community standard of care in their care and discharge of him.

\ \ \ \ \

9. Instead, the evidence presented at trial demonstrates that at every stage of his care—in the initial screening and risk assessment, admission to Unit 5C, treatment recommendations, discharge planning, and follow-up attempts—Adams's medical providers exercised the reasonable care and diligence that would be used by ordinary careful physicians in an inpatient psychiatric setting.

10. This evidence is corroborated by the testimony of Dr. Bryan, who discussed Adams's treatment plan in detail and testified that the "care plan implemented for [Adams's] diagnoses and problem list meet[s] the standard of care of a reasonable mental health care provider."  Tr. 326-28, 330-31.  Given the specific details Dr. Bryan referenced— particularly when contrasted with Dr. Joiner's relative unfamiliarity with Adams's medical record—the court finds Dr. Bryan's opinion on this matter is entitled to greater weight and carries more persuasive force.

11. Therefore, Plaintiff has not satisfied the first and second statutory requirements under Oregon's wrongful death statute.

*B. Causation*

12. In a medical negligence wrongful death case, a plaintiff must demonstrate that the defendant's conduct was the cause-in-fact of the decedent's death. *Chapman v. Mayfield*, 358 Or. 196, 205 (2015); *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 340 (2004) ("A plaintiff, of course, must prove 'factual' or 'but-for' causation—that there is a causal link between the defendant's conduct and the plaintiff's harm[.]").  Factual causation "generally requires evidence of a reasonable probability that, but for the defendant's negligence, the plaintiff would not have been harmed." *Joshi*, 198 Or. App. at

Page 32 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

538-39; *see also*, *Cedarberg v. Legacy Health*, Case No. 3:18-cv-02044-HZ, 2020 WL 5809991 *7 (D. Or. 2020) (holding expert opinion that psychiatric discharge of a patient caused the psychiatric patient to shoot plaintiff 24 days later was too speculative).

13. Plaintiff has not met her burden to prove that that the alleged negligence of Adams's medical providers caused his death. Specifically, Plaintiff cannot prove causation here because her theory requires this court to impermissibly speculate as to whether a longer hospitalization would have prevented Adams's suicide 24 days later.

14. The evidence presented at trial does not support a conclusion that, had VA physicians kept Adams in the acute inpatient psychiatric ward for a longer period of time, he would not have attempted or committed suicide in the weeks following his discharge. Instead, the evidence strongly suggests that a longer stay in inpatient care would not have addressed Adams's chronic risk factors—and, in fact, likely would have exacerbated them.

15. Further, given Adams's history of refusing to engage with mental health providers and comply with treatment recommendations, it is entirely speculative to presume that an additional two or three weeks of inpatient hospitalization would have "taken root," such that Adams's chronic mental illness would have resolved to the point that he would never have attempted suicide.

16. Finally, the note left by Adams at his death, which listed Ms. Maschinot's phone number and stated "[i]t was on purpose ask the VA," is subject to multiple interpretations, none of which prove causation. First, Adams could have left the note as an explanation for Ms. Maschinot, who was not aware of his suicidality. Second, even if Adams intended the note as blame rather than an explanation, several intervening events—including Adams's

volunteer service with Meal-on-Wheels, his friendship with Ms. Maschinot, and completion of his exams with passing scores—demonstrate that Adams, while still at chronic risk of suicide, was not at high imminent risk when he was discharged from Unit 5C. Any number of unknown interactions or environmental stressors could have triggered Adams's acute risk factors and sent him into crisis in early September.

17. Accordingly, Plaintiff has not proven, to a reasonable degree of medical or scientific certainty, that the treatment and discharge decisions made by Adams's medical team on Unit 5C were a cause-in-fact of his death. Plaintiff has not met her burden on this element.

For all the foregoing reasons, the court finds for the Defendant.

DATED this 16th day of May, 2022

_____
John V. Acosta
U.S. Magistrate Judge